IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Donald D. Thibeau, an individual, and Joseph H. Bockelman, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>TransUnion, LLC, a limited liability company,<br><br>Defendant. | Case No.<br><br>FILED: JUNE 23, 2008<br>08CV3588<br>JUDGE DOW<br>MAGISTRATE JUDGE SCHENKIER<br><br>DAJ |

## COMPLAINT

For their Complaint herein, Plaintiffs Donald D. Thibeau ("Thibeau") and Joseph H. Bockelman ("Bockelman") (collectively "Plaintiffs"), by and through their counsel, Perkins Coie LLP, allege as follows:

### PARTIES

1.      Thibeau, an individual, is a resident and citizen of State of Maryland.  Thibeau resides at 6515 Callander Drive in Bethesda, Maryland 20817.

2.      Bockelman, an individual, is a resident and citizen of the State of Ohio. Bockelman resides at 1331 S. Main Street in Springboro, Ohio 45066.

3.      TransUnion, LLC ("Trans Union" or "Defendant") is a private Delaware limited liability company with its principal place of business in Chicago, Illinois.  According to the Illinois Secretary of State, Trans Union is a manager-managed limited liability company with two managers --Siddarth N. Mehta, a citizen of the State of Illinois with a business address of 555 W. Adams Street, Chicago, Illinois 60661 and John Blenke, a citizen of the State of Illinois with a business address of 555 W. Adams Street, Chicago, Illinois 60661.  Upon information and belief, none of TransUnion's members are citizens of Maryland or Ohio.  According to the Alaska Department of Commerce, TransUnion's members are John Blenke, a citizen of the State of Illinois, and Harry Gambill of 555 W. Adams Street, Chicago, Illinois, also a citizen of the State of Illinois.

## JURISDICTION AND VENUE

4.      Subject matter jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and complete diversity of citizenship exists among the parties.

5.      In addition, the Employment Agreements identified in Paragraphs 7 and 8 below provide "each of the parties agrees that any litigation based hereon, or arising out of, under, or in connection with this Agreement, shall be brought and maintained exclusively in the United States District Court for the Northern District of Illinois." Employment Agreements at ¶16(d).

6.      Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(a).

## FACTUAL ALLEGATIONS

7.      Thibeau was employed by TransUnion as Vice President, Business Development pursuant to the terms of an Employment Agreement dated as of August 24, 2006. A true and correct copy of Thibeau's executed Employment Agreement is attached to the Complaint as Exhibit A. Thibeau fully performed all of his duties and obligations under the Employment Agreement.

8.      Bockelman was employed by TransUnion as Vice President, Business Development pursuant to the terms of an Employment Agreement dated as of August 24, 2006. A true and correct copy of Bockelman's executed Employment Agreement is attached to the Complaint as Exhibit B. Bockelman fully performed all of his duties and obligations under the Employment Agreement.

9.      On or about August 1, 2007, TransUnion falsely accused each of the Plaintiffs of breaching fiduciary duties and of engaging in fraudulent third party billing practices and terminated the employment of each of the Plaintiffs allegedly for "cause" under the terms of their respective Employment Agreements.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

10.      Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1 through 9, above.

11.     TransUnion did not have "cause" to terminate the employment of Plaintiffs and TransUnion breached the material terms of Thibeau's and Bockelman's Employment Agreements by terminating Plaintiffs' employment for "cause."

12.     As a result of TransUnion's breach of contract, Thibeau and Bockelman have each suffered economic damages in an amount to be determined at trial, but in no event less than $500,000.00 each.

13.     Pursuant to the terms of their respective Employment Agreements, Thibeau and Bockelman are entitled to recover their reasonable attorney fees, costs and expenses.

## SECOND CAUSE OF ACTION
### (Defamation)

14.     Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations in paragraphs 1 through 13, above.

15.     In connection with TransUnion's termination of Plaintiffs' employment, TransUnion knowingly published defamatory statements falsely accusing each of the Plaintiffs of breaching fiduciary duties and of being complicit in certain fraudulent third party billing practices.

16.     As a result of TransUnion's defamatory statements, Thibeau and Bockelman have each suffered damages in an amount to be determined at trial, but in no event less than $1,000,000.00 each.

17.     TransUnion acted with malice in publishing defamatory statements regarding the Plaintiffs, and therefore, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial, but in no event less than $2,000,000.00 each.

## PRAYER FOR RELIEF

Plaintiffs Thibeau and Bockelman pray for the following relief:

A.     Judgment in favor of Plaintiffs against Defendant for economic damages in an amount to be proven at trial, but in no event less than $500,000.00 per Plaintiff.

B.     Judgment in favor of Plaintiffs and against Defendant for non-economic damages

in an amount to be proven at trial, but in no event less than $1,000,000.00 per Plaintiff.

C.      Judgment in favor of Plaintiffs and against Defendant for exemplary damages in an amount to be proven at trial, but in no event less than $2,000,000.00 per Plaintiff.

D.      Judgment in favor of Plaintiffs against Defendant for attorneys' fees, costs and expenses in an amount to be proven at trial.

E.      Judgment in favor of Plaintiffs and against Defendant for such other and further relief as this Court deems just and proper.

Dated: June 23, 2008

By: s/Laurence J. Oleksa
                              One of Their Attorneys

Craig T. Boggs (ARDC No. 6198435)
Laurence J. Oleksa (ARDC No. 6275635)
**PERKINS COIE LLP**
131 South Dearborn Street, Suite No. 1700
Chicago, Illinois 60603
(312) 324-8400 (phone)
(312) 324-9400 (fax)
cboggs@perkinscoie.com
loleksa@perkinscoie.com

*Attorneys for Plaintiffs Donald D. Thibeau,
and Joseph H. Bockelman*

# EXHIBIT A



**TransUnion**  555 West Adams Street
Chicago, Illinois 60661
Tel 312 258 1717
www.transunion.com

August 24, 2006

Mr. Donald D. Thibeau
6515 Callander Drive
Bethesda Maryland 20817

                 Re:     **Employment Agreement**

Dear Don:

        Contingent upon the closing of the transactions (the "Closing") contemplated by that certain Asset
Purchase Agreement, dated as of July 31, 2006, among Trans Union LLC, a Delaware limited liability
company (the "Company"), TransUnion TeleData, LLC, an Oregon limited liability company, and Qsent,
Inc., a Delaware corporation, the Company is pleased to extend you an offer of employment by the
Company on the terms and conditions set forth in this letter agreement (this "Agreement"). Capitalized
terms used herein and not otherwise defined have the meanings ascribed thereto in Section 15 hereof.

        1.      Term.

                (a)     Contingent upon the occurrence of the Closing, the term of your employment
shall be for the period commencing on the effective date of the Closing (the "Effective Date") and
continuing through the second anniversary of the Effective Date (the "Term").

                (b)     If your employment is not terminated at or prior to the end of the Term, your
employment will thereafter be "at will" (i.e., terminable either by you or by the Company for any
reason or no reason), subject only to the notice provisions expressly set forth in Section 7, but not
subject to any of the other terms, compensation, bonuses or benefits stated herein, unless
different terms are established in a writing signed by both parties to this Agreement. The
provisions of Sections 8 through 16 hereof shall survive the expiration or termination of the Term
in accordance with their respective terms.

        2.      Duties. You will be employed by the Company as Vice President, Business Development
and in such other capacities and positions as may reasonably be assigned to you by the President or
Executive Vice President of U.S. Information Services of the Company (or the successors to such
persons or any other positions which, in the future, hold the duties that the current President or Executive
Vice President of U.S. Information Services now hold). As Vice President, Business Development, your
duties and responsibilities will include, without limitation, such duties and responsibilities customarily
performed by persons holding similar positions at the Company as reasonably may be assigned to you by
the President or Executive Vice President of U.S. Information Services of the Company (or the
successors to such persons or any other positions which, in the future, hold the duties that the current
President or Executive Vice President of U.S. Information Services now hold), with a primary focus on the
operations of the Company's subsidiary TransUnion TeleData, LLC.

        3.      Required Time and Attention.

                (a)     Except as set forth in Section 3(b) hereof, while you are employed by the
Company, you agree to devote all of your full business time, attention, skill and effort exclusively

                                                    Employee's initials  DDT



Mr. Donald D. Thibeau
August 24, 2006
Page 2

to the performance of your duties and responsibilities to the Company. Unless specifically authorized by the Company's President of U.S. Information Services (or a more senior officer of the Company) in writing, you agree not to work for, consult with or provide personal services to, any Person other than the Company, including, without limitation, any work, consulting or services after business hours, on weekends or during vacation time.

(b)    Notwithstanding anything herein to the contrary, other than Section 10 hereof, nothing shall preclude you from (i) serving on the boards of directors of a reasonable number of other corporations or the boards of a reasonable number of trade associations and/or charitable organizations; (ii) engaging in charitable activities and community affairs; or (iii) managing your personal investments and affairs; provided that such activities do not interfere with the proper performance of your duties and responsibilities hereunder and are not otherwise reasonably considered to be inappropriate by the Company's board of directors.

4.    Compensation.

(a)    During the Term, you will be paid an annualized base salary of $250,000. Your base salary shall be paid in periodic installments in accordance with the Company's payroll practices, as such practices may be changed from time to time.

(b)    During the Term, you shall be eligible, but not entitled, to receive an annual performance-based bonus with a target of $50,000 based upon Company performance and your achievement of business objectives, to be paid at such time and in such amounts as the Company shall, in its sole discretion, determine (the "Performance Bonus"). Notwithstanding the first sentence of this Section 4(b), the Performance Bonus for 2006 is guaranteed at a minimum of $50,000, subject to proration for the portion of calendar year 2006 remaining after the Effective Date. The Performance Bonus for 2006 will be paid in March 2007. The Performance Bonuses for 2007 and 2008, for illustration purposes, will be structured similarly to that contained on Exhibit A and will be paid in March of the year following the conclusion of the applicable performance year. If your employment ends at the expiration of the Term, you will be eligible to receive a Performance Bonus for 2008 performance deemed to equal the applicable "target" amount, but subject to proration for the portion of calendar year 2008 prior to your termination date.

(c)    You shall be eligible to receive a retention bonus over the Term of this Agreement totaling $100,000 to be paid as follows: 50% ($50,000) on the first anniversary of the Effective Date and 50% ($50,000) on the second anniversary of the Effective Date, provided that, subject to Section 8, you remain actively employed with the Company on each such date and, solely with respect to the first anniversary of the Effective Date, you have not given notice of Resignation as of such date (the "Retention Bonus").

(d)    All compensation payable to you by the Company, including, without limitation, your base salary and bonus, if any, shall be subject to all applicable withholding and deductions, in accordance with the Company's payroll practices, as such practices may be changed from time to time, and applicable law.

5.    Benefits.  Solely for purposes of benefits eligibility, the Company will consider your original hire date with Qsent, Inc. in calculating your Company service time. Subject to applicable law, you shall be entitled to participate in any medical, dental or fringe benefit plans on terms, including co-pay and other similar arrangements, no less favorable than benefits which the Company may provide from time to time to similarly situated executives. You also shall be entitled to take four (4) weeks vacation during each twelve (12) month period of employment during the Term, approved in accordance with Company policy for similarly situated executives, as such policy may change from time to time.

Employee's initials  *DDT*

Mr. Donald D. Thibeau
August 24, 2006
Page 3

6.    Reimbursement of Expenses.  Subject to compliance with any applicable policies of the Company, as amended from time to time, you shall be entitled to receive reimbursement, upon submission of reasonable supporting documentation, for all reasonable business expenses incurred by you in connection with the performance of your duties under this Agreement, on terms not less favorable than the terms by which the Company reimburses expenses for other similarly situated employees, it being agreed that any expense the Company reimburses will be subject to an "accountable plan" that contains provisions satisfying any requirements of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder; provided, however, that the Company agrees to maintain an office for you within the Washington, D.C. metropolitan area.

7.    Ability to Terminate.  Notwithstanding Section 1, your employment by the Company may be terminated by you or the Company for any reason or no reason whatsoever.  The Company's termination of your employment without Cause or your Resignation shall be effected upon forty-five (45) days' prior written notice, and the date of termination in either such case will be the last day of such forty-five (45) day notice period.  At the Company's sole option, you may be released from your employment duties and obligations prior to the expiration of such forty-five (45) day notice period, but such release will not affect any compensation to which you are entitled pursuant to Section 8 hereof.  Notwithstanding the foregoing, the Term and your employment by the Company shall automatically terminate, effective immediately, upon your death, Permanent Disability or the Company's termination of your employment for Cause.

8.    Termination Obligations.

(a).    In the event your employment is terminated pursuant to Section 7, the Company's obligations to you under this Agreement will terminate as of the effective date of the termination, except that (i) the Company will pay you your base salary through the date of termination (including termination due to your death, Permanent Disability or for Cause) and all Company benefits which vested or accrued as a result of your employment on or prior to the effective date of the termination, at the time or times as such salary or benefits otherwise would have been payable; (ii) if termination is due to death or Permanent Disability, the Company will pay you a portion of each of the Retention Bonus and Performance Bonus that otherwise would have been due if you continued to be an employee of the Company through the anniversary of the Effective Date or through the end of the calendar year, as applicable, following such date of termination, in each case in an amount prorated through the date of termination, provided that such Performance Bonus amount (prior to proration hereunder) shall be deemed to equal the "target" amount for such Performance Year pursuant to Section 4(b); and (iii) in the event of the termination of your employment without Cause or your Resignation for Good Reason, subject to Section 9, the Company will pay you the amounts set forth in Section 8(b).

(b)    Subject to Section 9 and your and the Company's execution of a mutual general release in favor of you, on the one hand, and the Company and its Affiliates, on the other, in a form reasonably satisfactory to you and the Company, following the Company's termination of your employment without Cause or your Resignation for Good Reason, in addition to any payments made pursuant to clause (i) of Section 8(a) above, the Company will continue to pay you, in accordance with the Company's usual payroll practices and subject to all applicable withholding and deductions, your then-current base salary during the Severance Period and will pay you a portion of each of the Retention Bonus and Performance Bonus that otherwise would have been due if you continued to be an employee of the Company through the anniversary of the Effective Date or through the end of the calendar year, as applicable, following such date of termination, in each case in an amount prorated through the date of termination, provided that such Performance Bonus amount (prior to proration hereunder) shall be deemed to equal the applicable "target" amount for such year.  During the Severance Period, you shall not be considered an employee of the Company or any Affiliate thereof and will not earn or accrue any

Employee's initials _DDT_

Mr. Donald D. Thibeau
August 24, 2006
Page 4

vacation pay, sick pay or bonus (other than the Retention Bonus and Performance Bonus in accordance with the preceding sentence), and will not be entitled to receive medical, dental, fringe or any other employee benefits.

(c)    Following the date of the Company's termination of your employment for Cause, the date of your Resignation without Good Reason or the date of your death or Permanent Disability, the Company will have no further obligations, liabilities or responsibilities to you aside from those payments required to be made pursuant to clauses (i) and (ii) of Section 8(a) above and the obligations contained in Section 13. Any amount that is payable to you as a Retention Bonus or Performance Bonus pursuant to Section 8(a) or Section 8(b) above shall be paid no later than the date such bonus would have been paid to you had you continued in the employ of the Company.

9.    <u>Compliance with Covenants</u>. The Company's obligation to continue to make payments to you post-termination, in accordance with the terms of this Agreement, is expressly conditioned upon your complying in all respects and continuing to comply in all respects with your obligations under Sections 10 through 14 hereof following the date of termination.

10.    <u>Restrictive Covenants</u>. For the purposes of this Section 10, the term "Company" shall include the Company and TransUnion TeleData, LLC.

(a)    You agree that the Company has expended and will expend substantial time, effort and resources in developing and maintaining the Confidential Information and Trade Secrets (as defined in <u>Exhibit B</u>), customers and customer relationships of the Company.

(b)    You covenant and agree that, at all times from the Effective Date until the later of (i) the second anniversary of the Effective Date or (ii) the date which is twelve (12) months following the termination of your employment with the Company or any Affiliate, for any reason (the "<u>Restricted Period</u>"), you shall not, except as expressly permitted by this Agreement, directly or indirectly, on your own behalf or on behalf of any other Person, contact or do business with any customer or supplier of TransUnion TeleData, LLC or, to your knowledge, any other customer or supplier of the Business, with respect to any product or service which is competitive with any product or service which constitutes, is part of, constituted, or was part of, the Business, as conducted or, to your knowledge, planned to be conducted, as of the date of termination or at any time within the twelve (12) month period immediately preceding the date of termination or the date of such conduct (if you are then employed by the Company) (collectively, "<u>Competitive Products/Services</u>"). Nothing contained in this Section 10(b) shall prevent you from being employed by (A) any such supplier so long as such supplier is not a provider of credit or contact identity data, or (B) any such customer so long as such customer directly or indirectly operates a business segment that is not a primary or otherwise significant part of any business of such customer or its strategic partners which produces, designs, sells, distributes or markets Competitive Products/Services, and you do not, and continue to not, have any involvement whatsoever with the business or operations of such prohibited business segment; <u>provided</u>, <u>however</u>, that, with respect to any such prospective employment by a customer, prior to employing you, the prospective employer executes and delivers to the Company a written acknowledgement, in form satisfactory to the Company, that such prospective employer is aware of your execution of this Agreement and the terms of this Section 10 and that you will have no involvement with any such prohibited business segment.

(c)    You covenant and agree that, at all times during the Restricted Period, you shall not, except as expressly permitted by this Agreement, directly or indirectly, perform services in the same or similar capacity as you performed on behalf of the Company, either as owner, stockholder, partner, director, officer, employee, consultant, independent contractor or advisor, for

Employee's initials 

Mr. Donald D. Thibeau
August 24, 2006
Page 5

any of the following companies (or their successors, assigns or affiliated entities in the domestic credit reporting business):

> Equifax
> Experian
> Lexis Nexis
> ChoicePoint

Nothing in this agreement shall restrict associate from making an investment in and owning up to one percent (1%) of the common stock of any company listed above whose stock is listed on a national exchange or actively traded in an over-the-counter market, provided that such investment does not give associate the right or ability to control or influence the policy decisions of any direct competitor.

(d)    You covenant and agree that, at all times during the Restricted Period, you shall not, except as expressly permitted by this Agreement, divert or attempt to divert or take advantage of or attempt to take advantage of any actual or potential business or opportunities of the Company or any of its Affiliates engaged in a business similar to that of the Business, or any part thereof, of which you became aware as the result of your employment with the Company or any of its Affiliates and which relate specifically to the Business, or any part thereof, as conducted or, to your knowledge, planned to be conducted, as of the date of termination of your employment with the Company or at any time within the twelve (12) month period immediately preceding the date of termination or the date of such conduct (if you are then employed by the Company).

(e)    You agree that the Company has invested and will invest substantial time and effort in acquiring and maintaining its workforce. Accordingly, you agree that during the Restricted Period, you shall not, nor cause any other Person to, (i) hire away any individual who was employed by the Business at such time (if you are then employed by the Company) or at any time on or after that date which is six (6) months prior to your termination of employment, or (ii) directly or indirectly, entice, solicit or seek to induce or influence any such individual to leave his or her employment with the Business.

(f)    You acknowledge that should you violate any of the covenants contained in this Section 10 hereof or knowingly violate the agreements referenced in <u>Exhibit B</u> attached hereto and incorporated herein by this reference (except that, with regard to the phrase "any anticipated research and development" contained in Section 1 of the Employee's Agreement Regarding Inventions, Confidential Information and Trade Secrets, the Company agrees that it will interpret such clause as "any anticipated research and development relating to the Business") (collectively, the "<u>Restrictive Covenants</u>"), it will be difficult to determine the resulting damages to the Company and its Affiliates and, in addition to any other remedies the Company and its Affiliates may have, (i) the Company and its Affiliates shall be entitled to temporary injunctive relief without being required to post a bond and permanent injunctive relief without the necessity of proving actual damage; and (ii) the Company shall have the right to offset payments of compensation hereunder to the extent of any money damages incurred or suffered by the Company and its Affiliates as a result of your breach. The Company may elect to seek one or more of these remedies at its sole discretion on a case by case basis. Failure to seek any or all remedies in one case shall not restrict the Company from seeking any remedies in another situation. Such action by the Company shall not constitute a waiver of any of its rights.

(g)    It is the parties' intent that each of the Restrictive Covenants be read and interpreted with every reasonable inference given to its enforceability. However, it is also the parties' intent that if any term, provision or condition of the Restrictive Covenants is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the

Employee's initials _____



Mr. Donald D. Thibeau
August 24, 2006
Page 6

provisions thereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Finally, it is also the parties' intent that if a court should determine any of the Restrictive Covenants are unenforceable because of over-breadth, then the court shall modify said covenant so as to make it reasonable and enforceable under the prevailing circumstances.

(h)    In the event of any breach by you of any Restrictive Covenant, the running of the period of restriction shall be automatically tolled and suspended for the duration of such breach, and shall automatically recommence when such breach is remedied in order that the Company shall receive the full benefit of your compliance with each of the Restrictive Covenants.

(i)    You agree that the Restrictive Covenants shall be enforced independently of any other obligations between the Company, on the one hand, and you, on the other (other than the Company's obligation to make payments hereunder), and that the existence of any other claim or defense shall not affect the enforceability of the Restrictive Covenants or the remedies provided herein.

(j)    You acknowledge that the Company, in executing this Agreement, has placed significant reliance on your compliance with the Restrictive Covenants. Accordingly, you (i) shall not, directly or indirectly, make any claim that any of the Restrictive Covenants is unenforceable, and (ii) shall not, directly or indirectly, challenge or commence or institute any claim, lawsuit or action (or assert any counterclaim or cross claim) seeking to invalidate or reduce the scope of any of the Restrictive Covenants.

11.    <u>Representation</u>.  You hereby represent and warrant to the Company that you are not subject to any covenants, agreements or restrictions, including without limitation any covenants, agreements or restrictions arising out of your prior employment or independent contractor relationships, which would be breached or violated by your negotiation or execution of this Agreement or by your performance of your duties hereunder, and that you will not enter into or become subject to any covenants, agreements, or restrictions inconsistent with the foregoing.

12.    <u>Acknowledgement</u>.  You hereby acknowledge that a condition to your employment by the Company is your execution of and agreement to be bound by the standard form agreements of the Company and its Affiliates attached as <u>Exhibit B</u> hereto; <u>provided</u>, <u>however</u>, that you also acknowledge that such agreements shall not affect or modify the transfer of title to any assets acquired by the Company or its Affiliates from Qsent, Inc. You agree to execute or re-execute, as the case may be, the Company's standard form agreements executed by all of the Company's employees, as they may be reasonably amended, modified, supplemented or restated from time to time. You further acknowledge that you have had an opportunity and have been encouraged to discuss such standard form agreements fully with the Company and to review them with an attorney of your choosing before signing this Agreement and before signing any such standard form agreements in the future. You acknowledge that you have read and will read such standard form agreements, that you know and understand the contents of those attached hereto, and that you will sign such standard form agreements voluntarily and of your own free act and deed. If there is a conflict between any provision of this Agreement and any provision of any of the agreements included in <u>Exhibit B</u>, the provisions of this Agreement will govern.

13.    <u>Promise Not to Disparage</u>.  In further consideration for this Agreement, you and the Company, on behalf of itself and its subsidiaries, agree not to disparage the other party to this Agreement or any of the Company's subsidiaries and/or not to communicate, either in writing or orally, directly or indirectly, any statement that bears negatively on such party or any Company's subsidiary's reputation, services, products, principals, customers, policies, adherence to law (unless otherwise required by law), shareholders, officers, directors, executives, employees, representatives or business interests of such party or any Company subsidiary.

Employee's initials _____DPT_____





Mr. Donald D. Thibeau
August 24, 2006
Page 7

14.    <u>Prior Agreements</u>.  Upon becoming effective, this Agreement supersedes and replaces all prior employment agreements, arrangements or plans specifically relating to you that were entered into prior to the date hereof between the Company or any of its Affiliates and you, and you hereby release and fully discharge the Company, its subsidiaries, its Affiliates and any successor or assigns thereof, from any and all payments, claims, liabilities or obligations relating to or arising from those prior agreements, arrangements and plans.  You hereby acknowledge that (a) neither the Company nor its subsidiary TransUnion TeleData, LLC assumed any obligations or liabilities under any agreements, arrangements or plans between you and Qsent, Inc., and (b) Qsent, Inc. expressly retained all such obligations and liabilities.

15.    <u>Certain Definitions</u>.  For purposes of this Agreement, the following definitions will apply:

"<u>Affiliate</u>" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"<u>Business</u>" means the business conducted or planned to be conducted by the Company and its subsidiaries, if any, as of a specified date.  As of the Effective Date, the Business includes contact identity data collection and services, used by businesses in customer acquisition and retention, collections and recovery, and other identity resolution applications.

"<u>Cause</u>," with respect to the termination of your employment by the Company, means (a) your commission of an act of fraud, embezzlement or breach of a fiduciary duty to the Company (including without limitation the unauthorized disclosure of confidential or proprietary information of the Company, other than disclosure of immaterial confidential or proprietary information made by you in good faith); (b) your commission of a breach of any covenant, provision, term, condition, understanding or undertaking set forth in this Agreement, which breach, if capable of cure, is not cured within twenty (20) days after your receipt of written notice thereof from the Company, other than an immaterial breach committed by you in good faith; (c) your commission of a crime constituting a felony under applicable law; (d) the Company's exposure to any criminal liability caused by your conduct, unless such conduct was specifically and expressly directed by your superior or such conduct was performed by you in good faith with the reasonable belief that such conduct did not constitute a crime; (e) your habitual absenteeism, gross negligence, bad faith, or willful misconduct in the performance of your duties to the Company; <u>provided</u>, <u>however</u>, that habitual absenteeism shall only constitute "Cause" hereunder if such conduct recurs after the Company had notified you in writing of any such prior conduct; (f) your failure, after receipt of written notice from the Company, to render services or discharge duties to the Company which are requested in such notice and are within the scope of your employment (consistent with Section 2 hereof), which failure is not cured within twenty (20) days of your receipt of such notice from the Company; or (g) your habitual abuse of alcohol or any controlled substance or your reporting to work during normal business hours under the influence of alcohol or a controlled substance (other than those you are taking under a current prescription); <u>provided</u>, <u>however</u>, that, to the extent that an ability to cure is provided in any of the foregoing clauses, you will only have one opportunity to cure such conduct and the Company may terminate your employment without providing notice or cure period if such conduct recurs after the Company had properly notified you of any such prior conduct which you had (or purported to have) cured.

"<u>Good Reason</u>" means, with respect to your Resignation, the occurrence, without your express written consent, of any of the following events (unless such events are substantially corrected within twenty (20) days following the Company's receipt of written notice from you that you intend to Resign as a result of such event):

(i)    the failure of the Company to employ you in the title and capacity as Vice President, Business Development (or more senior title), with responsibilities

Employee's initials  _DDT_

Mr. Donald D. Thibeau
August 24, 2006
Page 8

substantially consistent with such title, except in connection with the termination of your
employment for Cause, Permanent Disability or death;

(ii)     the Company's requiring you to be based in an office outside the
Washington, D.C. metropolitan area (except for required travel on the Company's
business); or

(iii)     the Company's material breach of any of the provisions of this
Agreement relating to compensation, benefits, expense reimbursement or Section 13.

"Permanent Disability" means any event that results in your eligibility to receive benefits
under the Company's disability insurance policies, as in effect from time to time; provided,
however, that if the Company does not maintain disability insurance, "Permanent Disability" shall
mean your inability to perform substantially all of your duties and responsibilities to the Company,
with or without reasonable accommodation, by reason of a physical or mental disability or infirmity
for either (a) a continuous period of three (3) months or (b) 180 days (which need not be
continuous) during any consecutive 12-month period. The date of such Permanent Disability will
be (i) in the case of clause (a) above the last day of such three month period or, if later, the day
on which satisfactory medical evidence of such Permanent Disability is obtained by the Company,
or (ii) in the case of clause (b) above, such date as is determined in good faith by the Company's
board of directors. In the event that any disagreement or dispute arises between you and the
Company as to whether you have incurred a Permanent Disability, then, in any such event, you
will submit to a physical and/or mental examination by a competent and qualified physician
licensed under the laws of the District of Columbia who will be mutually selected by you and the
Company, and such physician will make the determination of whether you suffer from any
disability. In the absence of fraud or bad faith, the determination of such physician will be final
and binding upon both you and the Company. The cost of any such examination will be paid 50%
by you and 50% by the Company.

"Person" means an individual, a partnership, a corporation, a limited liability company, an
association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a
governmental entity (or any department, agency, or political subdivision thereof).

"Resign" or "Resignation" means your voluntary termination of your full-time employment
with the Company, but does not include a termination of employment due to death or Permanent
Disability.

"Severance Period" means the period of time beginning on the effective date of the
termination of your employment and ending on the date which is twelve (12) months after the
termination date.

16.     Miscellaneous.

(a)     The parties agree to cooperate in good faith in adopting any amendments to this
Agreement that may be required to avoid (i) inclusion in income of amounts payable under this
Agreement that constitute the deferral of compensation within the meaning of Section 409A of the
Internal Revenue Code of 1986, as amended (the "Code"), prior to the date such amounts are
paid to you and (ii) the imposition of the excise taxes and/or penalties imposed by Section 409A
of the Code.

(b)     This Agreement shall be governed by the internal laws (and not the conflicts of
law provisions) of the State of Illinois.

Employee's initials _DDT_

Mr. Donald D. Thibeau
August 24, 2006
Page 9

      (c)     TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

      (d)     Each of the parties agrees that any litigation based hereon, or arising out of, under, or in connection with this Agreement, shall be brought and maintained exclusively in the United States District Court for the Northern District of Illinois.

      (e)     In the event there is a dispute under this Agreement, including without limitation, concerning the Restrictive Covenants, the non-prevailing party shall be required to pay to the prevailing party all documented out-of-pocket fees, costs and expenses (including reasonable attorneys' fees) reasonably incurred by the prevailing party in connection with the dispute, whether or not litigation is actually commenced and including litigation of any appeal.

      (f)     If any provision of this Agreement is determined to be invalid under applicable law, such provision shall be ineffective and the remaining provisions of this Agreement shall continue in full force and effect. Nothing contained in this Agreement shall constitute a party's waiver of any rights or remedies it may have under applicable law, it being agreed that any such waiver shall be in writing.

      (g)     This Agreement shall not be assignable by you. This Agreement and all of your rights hereunder shall inure to the benefit of and be enforceable by your personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. If you should die while any amounts would still be payable to you hereunder if you had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to your devisee, legatee, or other designee or, if there be no such designee, to your estate.

      (h)     No provision of this Agreement may be modified amended, waived or discharged unless agreed to in writing, and signed and executed by you and the Company.

     If you are in agreement with the foregoing, please acknowledge your agreement in the place provided below and return an original of this Agreement to the Company, whereupon this Agreement shall become a binding agreement between the Company and you.

     Very truly yours,

     Trans Union LLC, a Delaware limited liability company

     By:_____

     Jeffrey Hellinga
     President, U.S. Information Services

Agreed to this _28_ day

of _August_

_Don Thibeau_

Donald D. Thibeau

Employee's initials _DDT_

## **Exhibit A**

## **SAMPLE\* TransUnion Bonus Plan**

**Bonus Range**                                     $25,000   -   $50,000   -   $75,000

| Measure | Weight | Floor | | Target | | Ceiling | |
|---|---|---|---|---|---|---|---|
| | | Basis | Bonus | Basis | Bonus | Basis | Bonus |
| Qsent Revenue\*\* | 40% | TBD | $10,000 | TBD | $20,000 | TBD | $30,000 |
| TransUnion Revenue Enhancements\*\* | 40% | TBD | $10,000 | TBD | $20,000 | TBD | $30,000 |
| Key Projects | 20% | TBD | $5,000 | TBD | $10,000 | TBD | $15,000 |

\*This bonus framework is included for illustrative purposes only and may be amended at the sole discretion of the Company where such amendments are made for other similarly situated employees. Bonus payments will occur in March of the calendar year following the performance year or at other such time in accordance with the Company's then-current pay practices as amended from time to time.

\*\*Amounts for revenue between the target and ceiling will be determined by interpolation.

Employee's initials _____*DDT*_____

## Exhibit B

See attached documents.

Employee's initials _____DDT_____



## EMPLOYEE'S AGREEMENT REGARDING
## INVENTIONS, CONFIDENTIAL INFORMATION AND TRADE SECRETS

In consideration of the continuation of my employment after this date by Trans Union LLC, and/or its affiliates (the "Company"), I agree as follows:

1.  I hereby assign to the Company the entire right, title and interest in and to all copyrights, patents, trademarks, service marks, trade names, moral rights, and all other intellectual property rights associated with any and all ideas, concepts, inventions, Confidential Information and Trade Secrets, as defined in Paragraph 3 below, discoveries, improvements, processes, methods, designs and works of authorship that relate to the Company's existing, past, or proposed business, products, services, research and development, or any anticipated research and development (collectively, the "Inventions"), which were, or will be, made by me, either solely or jointly with others, during any past or future period of employment with the Company.  I understand that, for the purposes of this Agreement, except as provided in Paragraph 6 below, Inventions shall be considered to have been made during my employment with the Company if they were conceived, in whole or in part, refined, developed or first practiced during my employment with the Company or within one year after my employment with the Company is terminated for any reason whatsoever.

2.  I represent that all Inventions that I have developed before being employed with the Company are fully disclosed in the attached memorandum.  I understand I am not assigning any existing Inventions that I developed before being employed by the Company and that any such Inventions are not subject to this Agreement.

3.  I understand that the phrase "Confidential Information and Trade Secrets" includes, but is not limited to, the following either developed, created or licensed by, belonging to, or in the possession of the Company: (i) Inventions, including all features of any Inventions, whether developed by me or the Company, or the Company's affiliates, not yet patented or published; (ii) computer source code, and research and development data; (iii) business information such as information regarding the Company's operations, product costs, vendor and customer lists, lists of approved components and sources, unpublished price lists, production schedules, business and marketing plans, technical plans, sales figures and all other financial and business information not yet publicly announced or publicly disclosed;

Employee's initials 

(iv) any other information not generally available to the public or to competitors of the Company or its affiliates which, if disclosed, would materially damage the Company or its affiliates or would aid or benefit a competitor; (v) any information obtained by the Company, or its affiliates, under an obligation of confidentiality, from third parties, whether such Company or affiliate obligations are pursuant to a non-disclosure or confidentiality agreement or otherwise; and (vi) consumer information, including, but not limited to, consumer credit information and non-public personal information such as information pertaining to Company employees, customers, or other third persons.

4.  I understand and agree that I shall not disclose any Inventions or Confidential Information and Trade Secrets to any other person, firm, association or corporation except as required in the fulfillment of my duties and responsibilities in my employment with the Company as such duties and responsibilities have been explicitly authorized by the Company. I also agree that I shall not use any Inventions or Confidential Information and Trade Secrets for the private benefit of myself or for the benefit of any other person, firm, association or corporation.

5.  I recognize that all records and copies of records concerning Inventions and Confidential Information and Trade Secrets made or received by me during my period of employment are the property of the Company exclusively and all such records are also deemed Confidential Information and Trade Secrets. I shall surrender to the Company all such records or copies of records if and when my employment is terminated, or at any time during my employment at the Company's request.

6.  I understand and agree that my obligations under this Agreement shall continue after the termination of my employment with the Company, for any reason whatsoever. However, I understand that this Agreement does not apply to any Inventions fully conceived, developed and reduced to practice after the termination of my employment with the Company and assigned to another company in accordance with an employment agreement with that company and in which I have no ownership.

7.  I agree to execute and deliver any appropriate instruments or documents, and take any other action, reasonably requested by the Company, to confirm the assignments and rights provided for in this Agreement and to enable the Company to perfect the same by filing, registration or otherwise, including but not limited to any patent, copyright and/or trademark applications, in any state, territory, or country.

Employee's initials _____

8. I understand and agree that if any provision or term of this Agreement is construed by a court of competent jurisdiction to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full force and effect without regard to the invalid portion. If any provision or term in Paragraphs 4 and/or 6 of this Agreement is declared invalid or unenforceable by a court of competent jurisdiction, the invalid and unenforceable portion shall be reformed to the maximum time and/or geographic limitations permitted by the applicable laws, so as to be valid and enforceable.

9. This Agreement shall be binding on my heirs, executors, legal representatives and assigns and shall inure to the benefit of any successors and assigns of the Company.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year written below.

_Don Thibeau_
**Signature of Employee**

_Donald Thibeau_
**Typewritten Name of Employee**

_VP Business Development_
**Position or Title**

_28 August 06_
**Date**

_[signature]_
**Witness-Supervisor**

Employee's initials  _DDT_

## INVENTIONS, DISCOVERIES AND IMPROVEMENTS
## MADE PRIOR TO EMPLOYMENT WITH TRANSUNION

| Date of Invention, Discovery or Improvement | Patent No. | Description of Invention, Discovery or Improvement | Individuals who Assisted in Creation/Development of Invention, Discovery or Improvement |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | *u/a* | |
| | | | |
| | | | |
| | | | |

Employee's initials _DDJ_

# EXHIBIT B



**TransUnion**    555 West Adams Street
Chicago, Illinois 60661
Tel 312 258 1717
www.transunion.com

August 24, 2006

Mr. Joseph H. Bockelman
1331 S. Main Street
Springboro Ohio 45066

        Re:     **Employment Agreement**

Dear Joe:

        Contingent upon the closing of the transactions (the "Closing") contemplated by that certain Asset Purchase Agreement, dated as of July 31, 2006, among Trans Union LLC, a Delaware limited liability company (the "Company"), TransUnion TeleData, LLC, an Oregon limited liability company, and Qsent, Inc., a Delaware corporation, the Company is pleased to extend you an offer of employment by the Company on the terms and conditions set forth in this letter agreement (this "Agreement"). Capitalized terms used herein and not otherwise defined have the meanings ascribed thereto in Section 15 hereof.

    1.     Term.

        (a)     Contingent upon the occurrence of the Closing, the term of your employment shall be for the period commencing on the effective date of the Closing (the "Effective Date") and continuing through the second anniversary of the Effective Date (the "Term").

        (b)     If your employment is not terminated at or prior to the end of the Term, your employment will thereafter be "at will" (i.e., terminable either by you or by the Company for any reason or no reason), subject only to the notice provisions expressly set forth in Section 7, but not subject to any of the other terms, compensation, bonuses or benefits stated herein, unless different terms are established in a writing signed by both parties to this Agreement. The provisions of Sections 8 through 16 hereof shall survive the expiration or termination of the Term in accordance with their respective terms.

    2.     Duties. You will be employed by the Company as Vice President, Business Development and in such other capacities and positions as may reasonably be assigned to you by the President or Executive Vice President of U.S. Information Services of the Company (or the successors to such persons or any other positions which, in the future, hold the duties that the current President or Executive Vice President of U.S. Information Services now hold). As Vice President, Business Development, your duties and responsibilities will include, without limitation, such duties and responsibilities customarily performed by persons holding similar positions at the Company as reasonably may be assigned to you by the President or Executive Vice President of U.S. Information Services of the Company (or the successors to such persons or any other positions which, in the future, hold the duties that the current President or Executive Vice President of U.S. Information Services now hold), with a primary focus on the operations of the Company's subsidiary TransUnion TeleData, LLC.

    3.     Required Time and Attention.

        (a)     Except as set forth in Section 3(b) hereof, while you are employed by the Company, you agree to devote all of your full business time, attention, skill and effort exclusively to the performance of your duties and responsibilities to the Company. Unless specifically authorized by the Company's President of U.S. Information Services (or a more senior officer of

Employee's initials _____

Mr. Joseph H. Bockelman
August 24, 2006
Page 2

the Company) in writing, you agree not to work for, consult with or provide personal services to, any Person other than the Company, including, without limitation, any work, consulting or services after business hours, on weekends or during vacation time.

(b)    Notwithstanding anything herein to the contrary, other than Section 10 hereof, nothing shall preclude you from (i) serving on the boards of directors of a reasonable number of other corporations or the boards of a reasonable number of trade associations and/or charitable organizations; (ii) engaging in charitable activities and community affairs; or (iii) managing your personal investments and affairs; provided that such activities do not interfere with the proper performance of your duties and responsibilities hereunder and are not otherwise reasonably considered to be inappropriate by the Company's board of directors.

4.    Compensation.

(a)    During the Term, you will be paid an annualized base salary of $200,000. Your base salary shall be paid in periodic installments in accordance with the Company's payroll practices, as such practices may be changed from time to time. In March 2007 and in March 2008, you will be eligible for increases to your then-current base salary based upon an annual performance review (such review to prorate 2006 performance measures from the Effective Date) and then-current Company compensation guidelines.

(b)    During the Term, you shall be eligible, but not entitled, to receive an annual performance-based bonus with a target of 25% of your then-current base salary based upon Company performance and your achievement of business objectives, to be paid at such time and in such amounts as the Company shall, in its sole discretion, determine (the "Performance Bonus"). Notwithstanding the first sentence of this Section 4(b), the Performance Bonus for 2006 is guaranteed at a minimum of $50,000, subject to proration for the portion of calendar year 2006 remaining after the Effective Date. The Performance Bonus for 2006 will be paid in March 2007. The Performance Bonuses for 2007 and 2008, for illustration purposes, will be structured similarly to that contained on Exhibit A and will be paid in March of the year following the conclusion of the applicable performance year. If your employment ends at the expiration of the Term, you will be eligible to receive a Performance Bonus for 2008 performance deemed to equal the applicable "target" amount, but subject to proration for the portion of calendar year 2008 prior to your termination date.

(c)    You shall be eligible to receive a retention bonus over the Term of this Agreement totaling $200,000 to be paid as follows: 50% ($100,000) on the first anniversary of the Effective Date and 50% ($100,000) on the second anniversary of the Effective Date, provided that, subject to Section 8, you remain actively employed with the Company on each such date and, solely with respect to the first anniversary of the Effective Date, you have not given notice of Resignation as of such date (the "Retention Bonus").

(d)    All compensation payable to you by the Company, including, without limitation, your base salary and bonus, if any, shall be subject to all applicable withholding and deductions, in accordance with the Company's payroll practices, as such practices may be changed from time to time, and applicable law.

5.    Benefits. Solely for purposes of benefits eligibility, the Company will consider your original hire date with Qsent, Inc. in calculating your Company service time. Subject to applicable law, you shall be entitled to participate in any medical, dental or fringe benefit plans on terms, including co-pay and other similar arrangements, no less favorable than benefits which the Company may provide from time to time to similarly situated executives. You also shall be entitled to take four (4) weeks vacation during each twelve (12) month period of employment during the Term, approved in accordance with Company policy for similarly situated executives, as such policy may change from time to time.

Employee's initials _____

Mr. Joseph H. Bockelman 
August 24, 2006
Page 3

6.    <u>Reimbursement of Expenses</u>. Subject to compliance with any applicable policies of the Company, as amended from time to time, you shall be entitled to receive reimbursement, upon submission of reasonable supporting documentation, for all reasonable business expenses incurred by you in connection with the performance of your duties under this Agreement, on terms not less favorable than the terms by which the Company reimburses expenses for other similarly situated employees, it being agreed that any expense the Company reimburses will be subject to an "accountable plan" that contains provisions satisfying any requirements of the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder; <u>provided, however</u>, that the Company agrees to maintain an office for you within the Dayton, Ohio metropolitan area.

7.    <u>Ability to Terminate</u>. Notwithstanding Section 1, your employment by the Company may be terminated by you or the Company for any reason or no reason whatsoever. The Company's termination of your employment without Cause or your Resignation shall be effected upon forty-five (45) days' prior written notice, and the date of termination in either such case will be the last day of such forty-five (45) day notice period. At the Company's sole option, you may be released from your employment duties and obligations prior to the expiration of such forty-five (45) day notice period, but such release will not affect any compensation to which you are entitled pursuant to Section 8 hereof. Notwithstanding the foregoing, the Term and your employment by the Company shall automatically terminate, effective immediately, upon your death, Permanent Disability or the Company's termination of your employment for Cause.

8.    <u>Termination Obligations</u>.

(a)    In the event your employment is terminated pursuant to Section 7, the Company's obligations to you under this Agreement will terminate as of the effective date of the termination, except that (i) the Company will pay you your base salary through the date of termination (including termination due to your death, Permanent Disability or for Cause) and all Company benefits which vested or accrued as a result of your employment on or prior to the effective date of the termination, at the time or times as such salary or benefits otherwise would have been payable; (ii) if termination is due to death or Permanent Disability, the Company will pay you a portion of each of the Retention Bonus and Performance Bonus that otherwise would have been due if you continued to be an employee of the Company through the anniversary of the Effective Date or through the end of the calendar year, as applicable, following such date of termination, in each case in an amount prorated through the date of termination, provided that such Performance Bonus amount (prior to proration hereunder) shall be deemed to equal the "target" amount for such Performance Year pursuant to Section 4(b); and (iii) in the event of the termination of your employment without Cause or your Resignation for Good Reason, subject to Section 9, the Company will pay you the amounts set forth in Section 8(b).

(b)    Subject to Section 9 and your and the Company's execution of a mutual general release in favor of you, on the one hand, and the Company and its Affiliates, on the other, in a form reasonably satisfactory to you and the Company, following the Company's termination of your employment without Cause or your Resignation for Good Reason, in addition to any payments made pursuant to clause (i) of Section 8(a) above, the Company will continue to pay you, in accordance with the Company's usual payroll practices and subject to all applicable withholding and deductions, your then-current base salary during the Severance Period and will pay you a portion of each of the Retention Bonus and Performance Bonus that otherwise would have been due if you continued to be an employee of the Company through the anniversary of the Effective Date or through the end of the calendar year, as applicable, following such date of termination, in each case in an amount prorated through the date of termination, provided that such Performance Bonus amount (prior to proration hereunder) shall be deemed to equal the applicable "target" amount for such year. During the Severance Period, you shall not be considered an employee of the Company or any Affiliate thereof and will not earn or accrue any vacation pay, sick pay or bonus (other than the Retention Bonus and Performance Bonus in

Employee's initials

Mr. Joseph H. Bockelman
August 24, 2006
Page 4

accordance with the preceding sentence), and will not be entitled to receive medical, dental, fringe or any other employee benefits.

(c)      Following the date of the Company's termination of your employment for Cause, the date of your Resignation without Good Reason or the date of your death or Permanent Disability, the Company will have no further obligations, liabilities or responsibilities to you aside from those payments required to be made pursuant to clauses (i) and (ii) of Section 8(a) above and the obligations contained in Section 13.  Any amount that is payable to you as a Retention Bonus or Performance Bonus pursuant to Section 8(a) or Section 8(b) above shall be paid no later than the date such bonus would have been paid to you had you continued in the employ of the Company.

9.      Compliance with Covenants.  The Company's obligation to continue to make payments to you post-termination, in accordance with the terms of this Agreement, is expressly conditioned upon your complying in all respects and continuing to comply in all respects with your obligations under Sections 10 through 14 hereof following the date of termination.

10.      Restrictive Covenants.  For the purposes of this Section 10, the term "Company" shall include the Company and TransUnion TeleData, LLC.

(a)      You agree that the Company has expended and will expend substantial time, effort and resources in developing and maintaining the Confidential Information and Trade Secrets (as defined in Exhibit B), customers and customer relationships of the Company.

(b)      You covenant and agree that, at all times from the Effective Date until the date which is twelve (12) months following the termination of your employment with the Company or any Affiliate, for any reason (the "Restricted Period"), you shall not, except as expressly permitted by this Agreement, directly or indirectly, on your own behalf or on behalf of any other Person, contact or do business with any customer or supplier of TransUnion TeleData, LLC or, to your knowledge, any other customer or supplier of the Business, with respect to any product or service which is competitive with any product or service which constitutes, is part of, constituted, or was part of, the Business, as conducted or, to your knowledge, planned to be conducted, as of the date of termination or at any time within the twelve (12) month period immediately preceding the date of termination or the date of such conduct (if you are then employed by the Company) (collectively, "Competitive Products/Services").  Nothing contained in this Section 10(b) shall prevent you from being employed by (A) any such supplier so long as such supplier is not a provider of credit or contact identity data, or (B) any such customer so long as such customer directly or indirectly operates a business segment that is not a primary or otherwise significant part of any business of such customer or its strategic partners which produces, designs, sells, distributes or markets Competitive Products/Services, and you do not, and continue to not, have any involvement whatsoever with the business or operations of such prohibited business segment; provided, however, that, with respect to any such prospective employment by a customer, prior to employing you, the prospective employer executes and delivers to the Company a written acknowledgement, in form satisfactory to the Company, that such prospective employer is aware of your execution of this Agreement and the terms of this Section 10 and that you will have no involvement with any such prohibited business segment.

(c)      You covenant and agree that, at all times during the Restricted Period, you shall not, except as expressly permitted by this Agreement, directly or indirectly, perform services in the same or similar capacity as you performed on behalf of the Company, either as owner, stockholder, partner, director, officer, employee, consultant, independent contractor or advisor, for any of the following companies (or their successors, assigns or affiliated entities in the domestic credit reporting business):

Employee's initials _____

Mr. Joseph H. Bockelman
August 24, 2006
Page 5

> Equifax
> Experian
> Lexis Nexis
> ChoicePoint

Nothing in this agreement shall restrict associate from making an investment in and owning up to one percent (1%) of the common stock of any company listed above whose stock is listed on a national exchange or actively traded in an over-the-counter market, provided that such investment does not give associate the right or ability to control or influence the policy decisions of any direct competitor.

(d)     You covenant and agree that, at all times during the Restricted Period, you shall not, except as expressly permitted by this Agreement, divert or attempt to divert or take advantage of or attempt to take advantage of any actual or potential business or opportunities of the Company or any of its Affiliates engaged in a business similar to that of the Business, or any part thereof, of which you became aware as the result of your employment with the Company or any of its Affiliates and which relate specifically to the Business, or any part thereof, as conducted or, to your knowledge, planned to be conducted, as of the date of termination of your employment with the Company or at any time within the twelve (12) month period immediately preceding the date of termination or the date of such conduct (if you are then employed by the Company).

(e)     You agree that the Company has invested and will invest substantial time and effort in acquiring and maintaining its workforce. Accordingly, you agree that at all times from the Effective Date until the later of (i) the second anniversary of the Effective Date or (ii) the date which is twelve (12) months following the termination of your employment with the Company or any Affiliate, for any reason, you shall not, nor cause any other Person to, (A) hire away any individual who was employed by the Business at such time (if you are then employed by the Company) or at any time on or after that date which is six (6) months prior to your termination of employment, or (B) directly or indirectly, entice, solicit or seek to induce or influence any such individual to leave his or her employment with the Business.

(f)     You acknowledge that should you violate any of the covenants contained in this Section 10 hereof or knowingly violate the agreements referenced in Exhibit B attached hereto and incorporated herein by this reference (except that, with regard to the phrase "any anticipated research and development" contained in Section 1 of the Employee's Agreement Regarding Inventions, Confidential Information and Trade Secrets, the Company agrees that it will interpret such clause as "any anticipated research and development relating to the Business") (collectively, the "Restrictive Covenants"), it will be difficult to determine the resulting damages to the Company and its Affiliates and, in addition to any other remedies the Company and its Affiliates may have, (i) the Company and its Affiliates shall be entitled to temporary injunctive relief without being required to post a bond and permanent injunctive relief without the necessity of proving actual damage; and (ii) the Company shall have the right to offset payments of compensation hereunder to the extent of any money damages incurred or suffered by the Company and its Affiliates as a result of your breach. The Company may elect to seek one or more of these remedies at its sole discretion on a case by case basis. Failure to seek any or all remedies in one case shall not restrict the Company from seeking any remedies in another situation. Such action by the Company shall not constitute a waiver of any of its rights.

(g)     It is the parties' intent that each of the Restrictive Covenants be read and interpreted with every reasonable inference given to its enforceability. However, it is also the parties' intent that if any term, provision or condition of the Restrictive Covenants is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions thereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Finally, it is also the parties' intent that if a court should determine any of the

Employee's initials _____



Mr. Joseph H. Bockelman
August 24, 2006
Page 6

Restrictive Covenants are unenforceable because of over-breadth, then the court shall modify said covenant so as to make it reasonable and enforceable under the prevailing circumstances.

(h)    In the event of any breach by you of any Restrictive Covenant, the running of the period of restriction shall be automatically tolled and suspended for the duration of such breach, and shall automatically recommence when such breach is remedied in order that the Company shall receive the full benefit of your compliance with each of the Restrictive Covenants.

(i)    You agree that the Restrictive Covenants shall be enforced independently of any other obligations between the Company, on the one hand, and you, on the other (other than the Company's obligation to make payments hereunder), and that the existence of any other claim or defense shall not affect the enforceability of the Restrictive Covenants or the remedies provided herein.

(j)    You acknowledge that the Company, in executing this Agreement, has placed significant reliance on your compliance with the Restrictive Covenants. Accordingly, you (i) shall not, directly or indirectly, make any claim that any of the Restrictive Covenants is unenforceable, and (ii) shall not, directly or indirectly, challenge or commence or institute any claim, lawsuit or action (or assert any counterclaim or cross claim) seeking to invalidate or reduce the scope of any of the Restrictive Covenants.

11.    Representation.  You hereby represent and warrant to the Company that you are not subject to any covenants, agreements or restrictions, including without limitation any covenants, agreements or restrictions arising out of your prior employment or independent contractor relationships, which would be breached or violated by your negotiation or execution of this Agreement or by your performance of your duties hereunder, and that you will not enter into or become subject to any covenants, agreements, or restrictions inconsistent with the foregoing.

12.    Acknowledgement.  You hereby acknowledge that a condition to your employment by the Company is your execution of and agreement to be bound by the standard form agreements of the Company and its Affiliates attached as Exhibit B hereto; provided, however, that you also acknowledge that such agreements shall not affect or modify the transfer of title to any assets acquired by the Company or its Affiliates from Qsent, Inc. You agree to executive or re-execute, as the case may be, the Company's standard form agreements executed by all of the Company's employees, as they may be reasonably amended, modified, supplemented or restated from time to time. You further acknowledge that you have had an opportunity and have been encouraged to discuss such standard form agreements fully with the Company and to review them with an attorney of your choosing before signing this Agreement and before signing any such standard form agreements in the future. You acknowledge that you have read and will read such standard form agreements, that you know and understand the contents of those attached hereto, and that you will sign such standard form agreements voluntarily and of your own free act and deed. If there is a conflict between any provision of this Agreement and any provision of any of the agreements included in Exhibit B, the provisions of this Agreement will govern.

13.    Promise Not to Disparage.  In further consideration for this Agreement, you and the Company, on behalf of itself and its subsidiaries, agree not to disparage the other party to this Agreement or any of the Company's subsidiaries and/or not to communicate, either in writing or orally, directly or indirectly, any statement that bears negatively on such party or any Company's subsidiary's reputation, services, products, principals, customers, policies, adherence to law (unless otherwise required by law), shareholders, officers, directors, executives, employees, representatives or business interests of such party or any Company subsidiary.

14.    Prior Agreements.  Upon becoming effective, this Agreement supersedes and replaces all prior employment agreements, arrangements or plans specifically relating to you that were entered into prior to the date hereof between the Company or any of its Affiliates and you, and you hereby release and

Employee's initials _JHB_____



Mr. Joseph H. Bockelman
August 24, 2006
Page 7

fully discharge the Company, its subsidiaries, its Affiliates and any successor or assigns thereof, from any and all payments, claims, liabilities or obligations relating to or arising from those prior agreements, arrangements and plans. You hereby acknowledge that (a) neither the Company nor its subsidiary TransUnion TeleData, LLC assumed any obligations or liabilities under any agreements, arrangements or plans between you and Qsent, Inc., and (b) Qsent, Inc. expressly retained all such obligations and liabilities.

15.    Certain Definitions.  For purposes of this Agreement, the following definitions will apply:

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"Business" means the business conducted or planned to be conducted by the Company and its subsidiaries, if any, as of a specified date. As of the Effective Date, the Business includes contact identity data collection and services, used by businesses in customer acquisition and retention, collections and recovery, and other identity resolution applications.

"Cause," with respect to the termination of your employment by the Company, means (a) your commission of an act of fraud, embezzlement or breach of a fiduciary duty to the Company (including without limitation the unauthorized disclosure of confidential or proprietary information of the Company, other than disclosure of immaterial confidential or proprietary information made by you in good faith); (b) your commission of a breach of any covenant, provision, term, condition, understanding or undertaking set forth in this Agreement, which breach, if capable of cure, is not cured within twenty (20) days after your receipt of written notice thereof from the Company, other than an immaterial breach committed by you in good faith; (c) your commission of a crime constituting a felony under applicable law; (d) the Company's exposure to any criminal liability caused by your conduct, unless such conduct was specifically and expressly directed by your superior or such conduct was performed by you in good faith with the reasonable belief that such conduct did not constitute a crime; (e) your habitual absenteeism, gross negligence, bad faith, or willful misconduct in the performance of your duties to the Company; provided, however, that habitual absenteeism shall only constitute "Cause" hereunder if such conduct recurs after the Company had notified you in writing of any such prior conduct; (f) your failure, after receipt of written notice from the Company, to render services or discharge duties to the Company which are requested in such notice and are within the scope of your employment (consistent with Section 2 hereof), which failure is not cured within twenty (20) days of your receipt of such notice from the Company; or (g) your habitual abuse of alcohol or any controlled substance or your reporting to work during normal business hours under the influence of alcohol or a controlled substance (other than those you are taking under a current prescription); provided, however, that, to the extent that an ability to cure is provided in any of the foregoing clauses, you will only have one opportunity to cure such conduct and the Company may terminate your employment without providing notice or cure period if such conduct recurs after the Company had properly notified you of any such prior conduct which you had (or purported to have) cured.

"Good Reason" means, with respect to your Resignation, the occurrence, without your express written consent, of any of the following events (unless such events are substantially corrected within twenty (20) days following the Company's receipt of written notice from you that you intend to Resign as a result of such event):

(i)    the failure of the Company to employ you in the title and capacity as Vice President, Business Development (or more senior title), with responsibilities substantially consistent with such title, except in connection with the termination of your employment for Cause, Permanent Disability or death;

Employee's initials



Mr. Joseph H. Bockelman
August 24, 2006
Page 8

       (ii)     the Company's requiring you to be based in an office outside the Dayton, Ohio metropolitan area (except for required travel on the Company's business); or

       (iii)    the Company's material breach of any of the provisions of this Agreement relating to compensation, benefits, expense reimbursement or Section 13.

     "<u>Permanent Disability</u>" means any event that results in your eligibility to receive benefits under the Company's disability insurance policies, as in effect from time to time; <u>provided, however</u>, that if the Company does not maintain disability insurance, "Permanent Disability" shall mean your inability to perform substantially all of your duties and responsibilities to the Company, with or without reasonable accommodation, by reason of a physical or mental disability or infirmity for either (a) a continuous period of three (3) months or (b) 180 days (which need not be continuous) during any consecutive 12-month period. The date of such Permanent Disability will be (i) in the case of clause (a) above the last day of such three month period or, if later, the day on which satisfactory medical evidence of such Permanent Disability is obtained by the Company, or (ii) in the case of clause (b) above, such date as is determined in good faith by the Company's board of directors. In the event that any disagreement or dispute arises between you and the Company as to whether you have incurred a Permanent Disability, then, in any such event, you will submit to a physical and/or mental examination by a competent and qualified physician licensed under the laws of the State of Ohio who will be mutually selected by you and the Company, and such physician will make the determination of whether you suffer from any disability. In the absence of fraud or bad faith, the determination of such physician will be final and binding upon both you and the Company. The cost of any such examination will be paid 50% by you and 50% by the Company.

     "<u>Person</u>" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, or a governmental entity (or any department, agency, or political subdivision thereof).

     "<u>Resign</u>" or "<u>Resignation</u>" means your voluntary termination of your full-time employment with the Company, but does not include a termination of employment due to death or Permanent Disability.

     "<u>Severance Period</u>" means the period of time beginning on the effective date of the termination of your employment and ending on the date which is twelve (12) months after the termination date.

16.    <u>Miscellaneous</u>.

     (a)    The parties agree to cooperate in good faith in adopting any amendments to this Agreement that may be required to avoid (i) inclusion in income of amounts payable under this Agreement that constitute the deferral of compensation within the meaning of Section 409A of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), prior to the date such amounts are paid to you and (ii) the imposition of the excise taxes and/or penalties imposed by Section 409A of the Code.

     (b)    This Agreement shall be governed by the internal laws (and not the conflicts of law provisions) of the State of Illinois.

     (c)    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Employee's initials _____

Mr. Joseph H. Bockelman
August 24, 2006
Page 9

     (d)    Each of the parties agrees that any litigation based hereon, or arising out of, under, or in connection with this Agreement, shall be brought and maintained exclusively in the United States District Court for the Northern District of Illinois.

     (e)    In the event there is a dispute under this Agreement, including without limitation, concerning the Restrictive Covenants, the non-prevailing party shall be required to pay to the prevailing party all documented out-of-pocket fees, costs and expenses (including reasonable attorneys' fees) reasonably incurred by the prevailing party in connection with the dispute, whether or not litigation is actually commenced and including litigation of any appeal.

     (f)    If any provision of this Agreement is determined to be invalid under applicable law, such provision shall be ineffective and the remaining provisions of this Agreement shall continue in full force and effect. Nothing contained in this Agreement shall constitute a party's waiver of any rights or remedies it may have under applicable law, it being agreed that any such waiver shall be in writing.

     (g)    This Agreement shall not be assignable by you. This Agreement and all of your rights hereunder shall inure to the benefit of and be enforceable by your personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees. If you should die while any amounts would still be payable to you hereunder if you had continued to live, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to your devisee, legatee, or other designee or, if there be no such designee, to your estate.

     (h)    No provision of this Agreement may be modified amended, waived or discharged unless agreed to in writing, and signed and executed by you and the Company.

If you are in agreement with the foregoing, please acknowledge your agreement in the place provided below and return an original of this Agreement to the Company, whereupon this Agreement shall become a binding agreement between the Company and you.

Very truly yours,

Trans Union LLC, a Delaware limited liability company

By: _____

Jeffrey Hellinga
President, U.S. Information Services

Agreed to this 29 day

of August, 2006

Joseph H. Bockelman

Employee's initials _____

## Exhibit A

### SAMPLE* TransUnion Bonus Plan

**Bonus Range**                                        $25,000    -    $50,000    -    $75,000

| Measure | Weight | Floor | | Target | | Ceiling | |
|---|---|---|---|---|---|---|---|
| | | Basis | Bonus | Basis | Bonus | Basis | Bonus |
| Qsent Revenue** | 40% | TBD | $10,000 | TBD | $20,000 | TBD | $30,000 |
| TransUnion Revenue Enhancements** | 40% | TBD | $10,000 | TBD | $20,000 | TBD | $30,000 |
| Key Projects | 20% | TBD | $5,000 | TBD | $10,000 | TBD | $15,000 |

*This bonus framework is included for illustrative purposes only and may be amended at the sole discretion of the Company where such amendments are made for other similarly situated employees. Bonus payments will occur in March of the calendar year following the performance year or at other such time in accordance with the Company's then-current pay practices as amended from time to time.

**Amounts for revenue between the target and ceiling will be determined by interpolation.

Employee's initials

**<u>Exhibit B</u>**

See attached documents.

Employee's initials



## EMPLOYEE'S AGREEMENT REGARDING
## INVENTIONS, CONFIDENTIAL INFORMATION AND TRADE SECRETS

In consideration of the continuation of my employment after this date by Trans Union LLC, and/or its affiliates (the "Company"), I agree as follows:

1.  I hereby assign to the Company the entire right, title and interest in and to all copyrights, patents, trademarks, service marks, trade names, moral rights, and all other intellectual property rights associated with any and all ideas, concepts, inventions, Confidential Information and Trade Secrets, as defined in Paragraph 3 below, discoveries, improvements, processes, methods, designs and works of authorship that relate to the Company's existing, past, or proposed business, products, services, research and development, or any anticipated research and development (collectively, the "Inventions"), which were, or will be, made by me, either solely or jointly with others, during any past or future period of employment with the Company. I understand that, for the purposes of this Agreement, except as provided in Paragraph 6 below, Inventions shall be considered to have been made during my employment with the Company if they were conceived, in whole or in part, refined, developed or first practiced during my employment with the Company or within one year after my employment with the Company is terminated for any reason whatsoever.

2.  I represent that all Inventions that I have developed before being employed with the Company are fully disclosed in the attached memorandum. I understand I am not assigning any existing Inventions that I developed before being employed by the Company and that any such Inventions are not subject to this Agreement.

3.  I understand that the phrase "Confidential Information and Trade Secrets" includes, but is not limited to, the following either developed, created or licensed by, belonging to, or in the possession of the Company: (i) Inventions, including all features of any Inventions, whether developed by me or the Company, or the Company's affiliates, not yet patented or published; (ii) computer source code, and research and development data; (iii) business information such as information regarding the Company's operations, product costs, vendor and customer lists, lists of approved components and sources, unpublished price lists, production schedules, business and marketing plans, technical plans, sales figures and all other financial and business information not yet publicly announced or publicly disclosed;

Employee's initials _____

(iv) any other information not generally available to the public or to competitors of the Company or its affiliates which, if disclosed, would materially damage the Company or its affiliates or would aid or benefit a competitor; (v) any information obtained by the Company, or its affiliates, under an obligation of confidentiality, from third parties, whether such Company or affiliate obligations are pursuant to a non-disclosure or confidentiality agreement or otherwise; and (vi) consumer information, including, but not limited to, consumer credit information and non-public personal information such as information pertaining to Company employees, customers, or other third persons.

4.   I understand and agree that I shall not disclose any Inventions or Confidential Information and Trade Secrets to any other person, firm, association or corporation except as required in the fulfillment of my duties and responsibilities in my employment with the Company as such duties and responsibilities have been explicitly authorized by the Company.  I also agree that I shall not use any Inventions or Confidential Information and Trade Secrets for the private benefit of myself or for the benefit of any other person, firm, association or corporation.

5.   I recognize that all records and copies of records concerning Inventions and Confidential Information and Trade Secrets made or received by me during my period of employment are the property of the Company exclusively and all such records are also deemed Confidential Information and Trade Secrets. I shall surrender to the Company all such records or copies of records if and when my employment is terminated, or at any time during my employment at the Company's request.

6.   I understand and agree that my obligations under this Agreement shall continue after the termination of my employment with the Company, for any reason whatsoever.  However, I understand that this Agreement does not apply to any Inventions fully conceived, developed and reduced to practice after the termination of my employment with the Company and assigned to another company in accordance with an employment agreement with that company and in which I have no ownership.

7.   I agree to execute and deliver any appropriate instruments or documents, and take any other action, reasonably requested by the Company, to confirm the assignments and rights provided for in this Agreement and to enable the Company to perfect the same by filing, registration or otherwise, including but not limited to any patent, copyright and/or trademark applications, in any state, territory, or country.

Employee's initials



8. I understand and agree that if any provision or term of this Agreement is construed by a court of competent jurisdiction to be invalid or unenforceable, the same shall not affect the remainder of this Agreement, which shall be given full force and effect without regard to the invalid portion. If any provision or term in Paragraphs 4 and/or 6 of this Agreement is declared invalid or unenforceable by a court of competent jurisdiction, the invalid and unenforceable portion shall be reformed to the maximum time and/or geographic limitations permitted by the applicable laws, so as to be valid and enforceable.

9. This Agreement shall be binding on my heirs, executors, legal representatives and assigns and shall inure to the benefit of any successors and assigns of the Company.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year written below.

_____
**Signature of Employee**

JOSEPH H. BOCKELMAN
_____
**Typewritten Name of Employee**

VP
_____
**Position or Title**

8/29/2006
_____
**Date**

_____ 9-5-06
**Witness-Supervisor**

Employee's initials _____

## INVENTIONS, DISCOVERIES AND IMPROVEMENTS
## <u>MADE PRIOR TO EMPLOYMENT WITH TRANSUNION</u>

| Date of Invention, Discovery or Improvement | Patent No. | Description of Invention, Discovery or Improvement | Individuals who Assisted in Creation/Development of Invention, Discovery or Improvement |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Employee's initials